Good morning, Your Honors, Michael Dyer on behalf of the Appellant Plaintiff Amanda Hatt. This case stems from a motion for summary judgment granted by Judge Beislang in Sacramento on a bad faith action filed against Depositors Insurance. The trial court was not privy to the controlling case in the case being the Wilson v. 21st Century, a case at the time he made the decision, and it most likely would have had a different result had he had that decision, in my opinion. But in any case, the heirs – The basic principles governing genuine disputes were on the books. Yes, but they weren't delineated clearly as they are in Wilson. And I do believe Judge Beislang erred in two areas even without that precedent available to him. First and most particularly, he failed to view the facts in a light most favorable to the plaintiff. In fact, he did just the opposite. His statement of the facts viewed the facts in a light most favorable to the defendant, in particular as to when Ms. Hatt had reached maximum medical improvement and been released by her doctor. Ms. Hatt testified or provided in her declaration and in her deposition testimony that this occurred in June of 2003. The trial court took the independent medical exam that didn't occur until November of 2004 and said that because she had received chiropractic treatment a year later that she was still under treatment and therefore their delay was reasonable. And this is just incorrect. I mean, she still receives chiropractic treatment to this day, and the chiropractic treatment had to do with pain in her back, not the devastating injury she had to her lower leg, which was the commutative fracture and the crush to her calf muscle. She was released from that care in 2003. And this is a case, the bad faith case in the underlying case has to do with the cumulative nature of the delay on the one part and the outrageous conduct of the insurance company on the other part. The delay is when Ms. Hatt was injured in November of 2001, she was 17 and beginning her senior year in high school. By the time the first reasonable offer was made, she had graduated from high school and graduated from college and was looking to go away on an internship to England. And by the first reasonable offer, you exclude the offer for $125,000? Yes. I think the $125,000 on its face was blatantly insufficient and formed on grounds that have nothing to do with her injury and the underlying medical and special damages. As set out in Ms. Hatt's declaration, the initial meeting she had or the several meetings she had with Mr. Sturm, the adjuster, he asked, she told him, I need this case resolved. I've gone away to college and had all kinds of personal problems that were delineated in her declaration. And Mr. Sturm extracted from her, well, how much do you need for college? And she said, well, I think about $125,000 total. And so from that point that he got that number, there were 17 months elapsed in between the time, June 2003, to the last meeting with him in about that same timeframe, to November of 2004, and no communication whatsoever. No treatment, no communication, nothing done to advance this case. Ms. Hatt had made several demands for arbitration, which were ignored. Her first attorney did likewise. Those were ignored. It wasn't until the second attorney came into the case and wrote bad faith letters saying, look, this needs to go forward or else, that Mr. Sturm then came to the office. This is now more than three years after the accident. And 17 months after she had finished treating and said, okay, well, here's the records, here's the expenses, I'll get you an offer. During all this period prior to the final acceptance of the $350,000 order, is she paying her medical expenses out of her own pocket? Are these covered by insurance? What's happening to her during this period? Her medical expenses? Yes. They're covered by insurance. Okay. And so part of this settlement is probably going to go off to that payer, that is to say, are those segregated? Yes. She had incurred $62,000 in medical bills at that point. Mr. Sturm represented to her that it was $47,000. But then when he met with the second attorney, myself, he amended that and included $62,000. There were some additionally incurred in between that time. Okay. But she's not in a position of having to front those expenses. That's correct, Your Honor. Okay. However, when they made that offer three years after the fact and during the 17-month delay, it bared no relationship to the injury or the medical bills. She had medical bills of $62,000, $9,000 in lost wages, all of which she had researched. He had the bills. He had the medical records. He had the evaluation of the doctors that she had suffered a permanent injury with a rod in her lower leg and also that would always be there, that she would probably need treatment throughout her life. And the most significant injury was the crush injury to the calf, which killed the muscle and atrophied. And so this attractive 17-year-old girl now has two different legs. One is normal and the other is atrophied and thin. So he was aware of all that. And if you look at it, it has over $70,000 in medical specials, and the first offer of $125,000 would equate to $55,000 in general damages, which is less than $1,000 a year for this lifelong injury. Well, from that point, additional demands for arbitration are made and additional delays occurred and then the outrageous behavior occurs. Now, the outrageous behavior by itself. When you say outrageous behavior, what precisely are you referring to? I'm referring to the fact that how discovery was conducted and it was. In this case? Pardon me? In this case? No, in the underlying case, in the uninsured motorist. In the uninsured motorist case, in front of the arbitrator? Pardon me? In front of the arbitrator? No, it was during the discovery phase. After they had already discovered informally the records and the bills and everything, they then sent interrogatories and request for documents asking for the same material, then set a deposition, and then asked for an IME, all of which was just repetitive of what had already been formed. But more importantly, it was how this investigation was conducted with its outrageous behavior that adds to the facts that create the bad faith. In particular, the harassment at the deposition where they refused to end the deposition. We cited excerpts from that deposition to show the behavior. And setting depositions and having her attorney come out to the depositions and then counseling them after the fact, and then showing up late to every deposition, and again we included letters asking for repayment of these expenses, which were ignored. And a key point in this case is Mr. Sturm told her, in violation of the insurance code, that you don't need a lawyer in this case. Your injury is so severe, you're probably going to get the policy limits. Don't waste your time on a lawyer. And the policy limits are 500, so he then offers 125. Right. After her second lawyer and after he delayed three years. And what that did do for Ms. Hatt is she said, well, I'm not going to hire a lawyer on a one-third contingent fee. I'm going to hire him by the hour. That will all save a lot of money in attorney's fees. And she ended up saving some, but not very much, because of how things were litigated and how they were drug on. And depositors was informed that this was an hourly rate case at the front end, and by dragging it out every time they did it, more money came out of her pocket. So Ms. Hatt is put in a position of, well, do I keep fighting this and keep paying my attorney, or do I settle it and go on with life after now five-and-a-half years of, or no, four-and-a-half years of litigation and wanting to go on with her life. Okay. Let's hear from the other side, and then we'll give you a minute. Good morning, Your Honors. John Quirio for Defendant Appellee, Depositor's Insurance Company. This Court should affirm the District Court's grant of summary judgment as there was a genuine dispute between the plaintiff and the defendant regarding the amount of plaintiff's uninsured motorist claim up until the time that that was settled in the amount of $350,000. Plaintiff sustained a fracture to her left femur, along with other injuries in the car accident. Once her medical condition and the scope of her injuries had stabilized, the total special damages, as the evidence in the record shows, that the total special damages she had sustained amounted to approximately $62,000. Plaintiff's counsel said that the $9,000 in lost wages was added to that. It's a little unclear from the record, but from the best I could tell, that appears to include lost wages. So the total special damages would be $62,000, even if it weren't, and it were approximately $70,000. The initial offer by defendant of $125,000 was a good-faith and reasonable offer to settle her uninsured motorist claim. Do you dispute that your insurance adjuster initially says, you don't need a lawyer, I think this is going to settle for the policy amount? We do in the larger sense, but from this record, that has to be assumed to be true for purposes of summary judgment. When you say dispute in the larger sense, you don't think he said it, but for purposes of summary judgment, we have to assume it's true? Exactly, Your Honor. So it is in the record, and we should assume that he initially said that for purposes of what's in front of us. Okay. It is in the record. And while that, just to clarify, this was in response to a question from her, should I retain a lawyer. And she says, and we should assume that it's true, he responds, no, you don't need to. This is going to settle for $500,000. Well, from what I recall, he said he estimated that it was probably a policy limits case of $500,000 and that a lawyer would likely take the normal contingent fee. He thought it would be a waste of time. So he's basically giving her legal advice? I wouldn't construe it that way. He's basically advising her what to do, and it turns out that his advice is wrong, both as to whether she needs a lawyer and as to whether this is going to settle for the policy amount. Well, I think that's perhaps a somewhat uncharitable way of putting it. She does need a lawyer, and she only gets $350,000. Well, she did end up getting a lawyer, and, in fact, two different lawyers over the course of the claim. The $125,000 offer represents approximately a one-to-one ratio between general damages, pain and suffering, and the special damages that are in the record that she incurred. That amount, while it may not be definitely what a jury would have awarded in a case against the uninsured motorist, certainly is within the range of reasonable amounts that a jury could have awarded in such a case, and thus it represents a genuine dispute that the plaintiff maintained the entire time that she wanted the full $500,000 based on medical specials plus lost wages of $62,000. In that sort of genuine dispute situation with the insurer, bad faith cannot be inferred from those facts. Most cases where bad faith has been found have involved something far more than what is at issue here. For instance, in the Wilson case, which opposing counsel referred to, which, incidentally, we don't believe, as Judge Pius recognized, changed the law. It simply clarified the law. The most important point of the Wilson case was that it affirmed that summary and judgment indeed can be granted based on the genuine dispute doctrine that had never been formally held by the California Supreme Court. Because there's more than just the genuine dispute in terms of what they're saying. To say it sort of gently, you guys didn't respond very promptly to an awful lot of requests. During that period, there was, between the period of the reporting of the accident in December 2001 and late 2004, the plaintiff was medically treating. We did communicate with the plaintiff during that time. There may have been some periods where the plaintiff felt that communication was not as good as she would have liked. But that — For example, as I recall the record, she asked for arbitration. You don't even respond. Well, with the arbitration demands that — Is that right? You don't even respond. The record does not disclose that we responded during that period. In other words, we should assume that you did not respond for purposes of this judgment. Right. For purposes of this question. We did eventually take the case into arbitration or discovery, preparing for arbitration, and then it settled before arbitration. The important thing with the arbitration demands, and the reason that the arbitration demands began to be made at the time that they were in October 2002, is that the uninsured motorist statute specifies that — a statute of limitations. Either one of three things has to happen within a year of the accident or else the claim is waived. A, the insured has to have instituted suit against the uninsured motorist. B, they have to have resolved the claim with the insurer. Or C, they have to have made an arbitration demand with the insurer within one year or else the claim is gone. So in fact, as I recall from the record, it was actually Mr. Sturm that warned plaintiff, you need to make sure you make an arbitration demand given the timeline here so that you preserve your rights as of, you know, certainly by the one-year deadline so your claim doesn't vaporize. So in any case, most bad faith cases have involved something far more than what is alleged here and has to assume to be true for purposes of summary judgment. For instance, the insurer totally disregarding and contradicting the opinion of the treating physician or retaining a sham expert solely for the purpose of contradicting the treating physician's opinion, trumping up arson charges, which was the Grunberg case from 1973. A more recent case, McCoy groundlessly accusing the plaintiff of having arranged to have his own car stolen without enough evidence. These are much more outrageous behaviors. They're not present in this case. And so we would submit that the bad faith claim, the summary judgment on the bad faith claim should be affirmed. I'd also like to briefly address the other claims at issue in this case, the intentional infliction of emotional distress and the prayer for punitive damages. If bad faith summary judgment is affirmed, then those would fall as well. The district court dismissed those claims as moot in light of his ruling on the bad faith claim. Even if you were to disagree with him, with the district judge, on the bad faith claim, we maintain the summary judgment should be affirmed as to those other points nevertheless. First of all, it's our position that the plaintiff did not raise those in her opening brief and therefore has waived them, that's set out in our briefs. Even if you wish to get to the merits of those claims, what is alleged in the record does not rise to the level of sufficiently outrageous behavior to constitute intentional infliction of emotional distress. The cases, California cases, have said clearly that bad faith alone does not constitute intentional inflection of emotional distress. If this case does constitute bad faith, which we claim it does not, it barely crosses that line. And it certainly does not cross the line into outrageous behavior not to be tolerated in a civilized community. By the same token, on the punitive damages issue, there is no evidence of malice, oppression, or fraud, certainly not by the clear and convincing evidence standard that California law requires in these sorts of situations. In fact, cited in the brief, the Tomaselli case, the trans-American insurance company, makes very clear that even what plaintiff has alleged has happened here, even if it does amount to bad faith, which, again, we say it does not, certainly does not make it eligible for the award of punitive damages. And therefore, the court's, the district court's ruling on those points should be affirmed on any view of the record. Although the ruling there was just that they were moot, right? Yes, that's true. But this Court is certainly free to and should affirm on any ground supported by the record. We'd like to review what the district court did. Indeed. In this case. He didn't really. I was just checking it because I didn't recall that. The district court did not. He explicitly ruled on those claims. He just knocked them out. That's true. He did not analyze the merits of those claims. But his ruling can certainly be affirmed on any ground supported by the record. And our position is that that certainly is warranted in a case such as this. Okay. If there are no other questions, we would submit. Okay. Thank you. One minute. Thank you, Your Honor. Briefly on the IIED claim and the punitive damage claim, we did refer to them in our brief at page 19 at the conclusion part where we say that the issue regarding the second fourth cause of action are set forth on pages 162 and 163 of the record. And those refer to the opposition to the motion for summary judgment specifically as to the IIED case and the punitive damages issues. So they were referred to by incorporation. And the reason it was done that way is that the trial court just said that those issues are moot. So there was no new argument, no new arguments to frame. And so we did it by reference to the underlying record. We believe that this entire case is about conduct, delay, and bad actions. And we believe that not only is there bad faith, but there's also outrageous conduct that would at least go to the jury on issues of intentional affliction of emotional distress and punitive damages. In particular, I'd quote from the Berkeley case where it says, generally conduct will be found to be actionable where the recitation of the facts to an average member of the community would rise. Oh, no, we're familiar with the case. We're okay on that.  Thank you. That's all I have. Thank you, Your Honor. Thank you very much. Case of Hatt v. Positor's Insurance now submitted for argument. Let me ask just for a moment to the members of the bench, do we need to take a break before we do the last two cases? We'll take a ten-minute break, and then we will resume.
judges: Hall, Fletcher W. , Paez